# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **D.B., a minor, by his next friend, and mother, ELIZABETH B.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No.** |
| **SUTTON SCHOOL DISTRICT, SUTTON SCHOOL COMMITTEE, and the MASSACHUSETTS DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION,** | ) ) ) ) ) ) | **10-10897-FDS** |
| **Defendants.** | ) ) ) | |

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This matter arises from an ongoing dispute concerning the provision of special-education services by a small school district. Plaintiff D.B. is a fifteen-year-old child who resides in Sutton, Massachusetts. D.B. has several disabilities that interfere with his ability to learn.

After obtaining a decision from a hearing officer of the Board of Special Education Appeals ("BSEA"), D.B.'s mother brought this action on his behalf, alleging that the Sutton School District, the Sutton School Committee (collectively "Sutton"), and the Massachusetts Department of Elementary and Secondary Education ("DESE") denied him a free appropriate public education.[1] The complaint seeks review of the portion of the BSEA decision finding that D.B.'s parents are not entitled to reimbursement for certain privately-funded education services.

---

[1] Although D.B. himself is nominally the party in this action, the Court will refer to the family collectively as "plaintiffs."

It asserts claims under four federal statutes:  (1) the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; (2) section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (3) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and (4) 42 U.S.C. § 1983.[2]  Sutton filed a counterclaim, alleging that D.B.'s parents were not entitled to reimbursement for any of their privately-arranged services.

Both plaintiffs and Sutton have moved for summary judgment, challenging different aspects of the BSEA decision.  The DESE opposes both motions, and requests that the Court affirm the decision.  For the following reasons, the Court will affirm the BSEA's decision.

## I.      The Statutory Framework

The IDEA conditions the provision of federal funds to state schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE").  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416)).  "Substantively, the free appropriate public education ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

### A.      Individualized Education Programs

The IEP is the statute's primary safeguard for assuring the provision of FAPE to disabled children.  IEPs are formulated through the participation of a team that includes the student's parents, at least one of the student's regular education teachers (if any), at least one special-education teacher, a representative of the local education agency, and an individual who can

---

[2] All but the IDEA claim have been dismissed.

interpret the instructional implications of evaluation results.  *North Reading Sch. Comm. v.*

*BSEA*, 480 F. Supp. 2d 479, 482 n.5 (D. Mass. 2007).   "Each IEP must include an assessment of

the child's current educational performance, must articulate measurable educational goals, and

must specify the nature of the special services that the school will provide."  *Schaffer ex rel.*

*Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see Roland M.*, 910 F.2d at 987 (citing 20 U.S.C. §

1401(19); 34 C.F.R. § 300.346).

> There is no mechanical checklist by which an inquiring court can determine the
> proper content of an IEP; IEPs are by their very nature idiosyncratic.  One thing is
> clear:  the substance of an IEP must be something different than the normal school
> curriculum and something more than a generic, one-size-fits-all program for
> children with special needs.

*Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (internal

quotation and citation omitted).  IEPs must be reviewed annually and revised when necessary.

*Roland M.*, 910 F.2d at 988.

## B.    __Appropriateness and Adequacy__

It is important to emphasize that the IDEA does not require perfection.

> The IDEA does not promise perfect solutions to the vexing problems posed by the
> existence of learning disabilities in children and adolescents.  The Act sets more
> modest goals:  it emphasizes an appropriate, rather than an ideal, education; it
> requires an adequate, rather than an optimal, IEP.  Appropriateness and adequacy
> are terms of moderation.  It follows that, although an IEP must afford some
> educational benefit to the handicapped child, the benefit conferred need not reach
> the highest attainable level or even the level needed to maximize the child's
> potential.

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citing *Rowley*, 458 U.S. at

198; *Roland M.*, 910 F.2d at 992).[3]

---

[3] Massachusetts had previously adhered to the higher standard of "maximum possible development" before
adopting the federal standard of "free appropriate public education," effective January 1, 2002.  *See* Mass. Gen.

A school system has met this obligation as long as the program that it offers to a disabled student is "reasonably calculated" to deliver "educational benefits." At bottom, this obligation is an obligation to provide an adequate and appropriate education. The IDEA does not place school systems under a compulsion to afford a disabled child an ideal or an optimal education.

*C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008) (quoting *Rowley*, 458 U.S. at 207).

### C.     Least Restrictive Environment

"The IDEA . . . articulates a preference for mainstreaming," that is, educating disabled students with non-disabled students as much as possible. *Lenn*, 998 F.2d at 1086 (citing 20 U.S.C. § 1412(5) (requiring states to educate disabled and non-disabled children together "to the maximum extent appropriate")). "Translated into practical application, this preference signifies that a student who would make educational progress in a day program is not entitled to a residential placement even if the latter would more nearly enable the child to reach his or her full potential." *Id.* (internal quotations and citations omitted).

### D.     Administrative Hearings

Should the parents of a disabled child wish to contest an IEP, the state is required to convene an impartial hearing. 20 U.S.C. § 1415(f)(1)(A). In Massachusetts, these hearings are conducted by the BSEA in accordance with rules that it has promulgated pursuant to Massachusetts law. Mass. Gen. Laws ch. 71B, § 3; 603 Mass. Code Regs. 28.08(5)(a); *see Roland M.*, 910 F.2d at 988. The decision of the BSEA is reviewable in either state or federal court, and the reviewing tribunal has broad discretion to grant such relief it determines is appropriate. 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *Roland M.*, 910 F.2d at 987-88.

---

Laws ch. 71B; *Wanham v. Everett Pub. Schs*, 550 F. Supp. 2d 152, 158 (D. Mass. 2008).

II.   **Background**

A.   **D.B.'s Developmental Disorders**

D.B. is a child who lives in Sutton, Massachusetts.  He was born in September 1996, and is now fifteen years old.

There is no dispute that D.B. is handicapped within the meaning of the IDEA.  When he was three months old, he developed a seizure disorder and infantile spasms.  As a result, he has suffered significant developmental delays in all areas, particularly in language skills and cognition.  (*See* AR at 466).

D.B. has been diagnosed with severe verbal apraxia and dysarthria.  (*Id.*).  Verbal apraxia is a disorder of motor speech planning and programming in which the neurological signals between the brain and the speech-producing muscles are not transmitted effectively.  As a result, a child with apraxia has difficulty learning how to produce and sequence sounds.  Dysarthria is characterized by hypotonia and muscle weakness.  D.B. has dysarthria associated with his speech-producing muscles, which interferes with his ability to produce certain sounds.  (*Id.*)

Because of its severity, D.B.'s disability exerts a pervasive impact on his educational progress, affecting speech, expressive communication, receptive communication, literacy and reading, social interaction, focus and attention, behavior, and general cognitive development. (*Id.*).  He also has significant motor and sensory processing challenges.  (*Id.*).  As a result, he has difficulty learning and performing many basic daily living skills, such as basic toileting skills and the ability to dress himself.  (*Id.*).  Because any assessment of his true potential is complicated by his communication disorders, D.B's actual cognitive abilities cannot be measured with certainty. (*See id.* at 466-67).

D.B. has also been diagnosed with an anxiety disorder, likely resulting from his other disabilities.  (*Id.* at 466).  He can be anxious when separated from his mother, and can become highly stressed in social situations with people with whom he is not familiar.  (*Id.*).  His anxiety has increased as he has become increasingly aware of his abilities and his limitations relative to others.  (*Id.* at 467).

## B.    History of Services in the Sutton Schools

### 1.    1996-2005

When he was about four months old, D.B. began receiving early intervention services to address delays in a variety of areas, including cognition, gross and fine motor skills, and receptive and expressive communication.  D.B. transitioned into the Sutton School District when he was three years old.  While at Sutton, several IEPs were developed and implemented to address his disabilities and provide him with FAPE.  He remained at Sutton until March 2005, when his parents unilaterally removed him from the school system after rejecting a proposed IEP for the 2005 school year.  (*Id.* at 464, 467-68).  D.B.'s parents have since arranged privately-provided services for him.  (*Id.*).[4]

Since 2005, D.B.'s parents and Sutton have worked together to develop new IEPs and to find a suitable placement for him.  Two of those IEPs are at issue in this dispute:  the IEP covering the period from October 25, 2007, to October 24, 2008 (the "2007-08 IEP"), and the IEP covering the period from October 27, 2008, to October 26, 2009 (the "2008-09 IEP").

---

[4] Since 2005, plaintiffs and Sutton have had several disputes regarding D.B.'s care that resulted in two BSEA decisions in Sutton's favor.  (AR at 475).  Plaintiffs appealed both decisions, and this Court affirmed the decision in both instances.  *See D.B. v. Esposito et al*, No. 07-40191 (D. Mass. Sep. 30, 2009); *D.B. v. Esposito, et al*, No. 07-40191 (D. Mass. Sep. 10, 2010).

2.      **2007-2008**

On April 12, 2007, following two prior BSEA disputes regarding D.B.'s 2005 IEPs, Margo Austein, Sutton's Director of Special Education, wrote D.B.'s parents a letter to set up a new IEP meeting.  (*Id.* at 469, 1993).[5]  D.B.'s parents provided Sutton with several reports and evaluations to provide information they thought were crucial to understanding his profile.  (*Id.* at 734-35).  They later advised Sutton that these reports were not intended to serve as the basis for a prospective IEP.  (*Id.* at 736).  Sutton convened an IEP meeting on June 13, 2007.  (*Id.* at 470).[6] The IEP team concluded that additional observations of D.B. were necessary before proposing a final IEP.  (*Id.*).

Following the meeting, several members of Sutton's staff carried out a number of observations of D.B., including observations by a speech-language pathologist, an occupational therapist, and special-education teachers.  (*Id.* at 470, 1994, 1998, 2000, 2003).  On October 2, 2007, Susan Messier, Sutton's speech-language pathologist, visited the Cotting School in Lexington, Massachusetts, to evaluate it as a possible placement to be discussed at the upcoming IEP meeting.  (*Id.* at 470).  Messier learned generally about Cotting's educational and related programing, but did not specifically discuss D.B.'s needs during her visit.  (*Id.*; *see also id.* at

---

[5] Sutton indicated it was beginning the process to comply with the earlier BSEA decision and to develop a new IEP to meet D.B.'s needs.  (AR at 469, 1993).  The BSEA decision (issued on March 28, 2007) stated: "Sutton shall immediately notify the Parents of their rights to evaluation and a new IEP based on current information per federal and state statues and regulations, and shall proceed with same upon receipt of parental consent."  *In Re Sutton Public Schools*, 13 MSER 95 (2007); (AR at 480).

[6] Sutton assembled a new IEP Team following the prior BSEA decision.  (AR at 2027).  This IEP Team included D.B.'s parents, the Director of Special Education, two special-education teachers (one of whom was a certified regular educator who had taught in a non-special education environment), a speech-language pathologist, and an occupational therapist.  (*Id.* at 496).

2095-96).   In her report following her visit, Messier noted that one potential weakness of Cotting was the apparent minimal access to one-on-one services.  (*Id.* at 2095).

The team reconvened for a meeting on October 25, 2007.  (*Id.* at 470).  The meeting began collaboratively—the team apparently agreed on the substance of the services that D.B. required.  (*Id.*).  However, D.B.'s parents became upset when Sutton suggested Cotting as a possible placement for their son. (*Id.*).  They had rejected Sutton's proposal of Cotting as an alternative placement in the 2005 IEPs, and were unaware that Sutton was again considering Cotting as a possible placement.[7]  Before the team had an opportunity to discuss the placement or possible alternatives, D.B.'s mother left the meeting.  (*Id.*).  Although D.B.'s father remained, the meeting ended shortly thereafter.  (*Id.*).

As a result of this meeting, an IEP was developed by Sutton for the period from October 25, 2007, to October 24, 2008.  The IEP proposed several one-on-one services, including speech-language and speech-apraxia services, fine-motor and sensory services, social-adjustment counseling, gross-motor physical therapy, and English Language Arts and Math tutoring.  (*Id.* at 468, 2047).[8]  The IEP also called for D.B. to be placed at Cotting.  (*Id.* at 468, 2052).

---

[7] As previously noted, D.B.'s parents challenged the 2005 IEPs.  In an opinion ruling in Sutton's favor, the hearing officer found, in *dicta*, that Cotting was an appropriate placement that would have provided D.B. with FAPE under the 2005 IEP.  *In re Sutton*, 13 MSER 95; (AR at 476).

[8] The 2007-08 IEP listed toileting as one of D.B.'s educational needs, and stated that a toileting schedule would need to be developed to address the issue and that "[s]pecific approaches shall be utilized for [D.B.] to follow regarding self-help and toileting development."  (AR at 2035).  The IEP set the following benchmark:

> [D.B.] will demonstrate improved functional dressing, hygiene/toileting, and grooming skills for greater independence in the school and home environments with decreasing levels of staff assistance to increase independence during his daily routine on 4 out of 5 presented opportunities as evidence[d] by data collection sheets.

(*Id.* at 2046).

D.B.'s parents sent a letter to Sutton, dated October 30, 2007, responding to the meeting, but not directly addressing the proposed IEP.  (*Id.* at 738-40).  In the letter, the parents expressed their concern that Sutton did not fully understand the nature of D.B.'s disability, and questioned the qualifications of the team members and their concern for D.B.  (*Id.*).  They also stated that they were concerned about some of the substance of the services that they discussed in the meeting and reiterated their displeasure in the "lack of creativity" in proposing Cotting as a placement.  (*Id.*).[9]  Despite their clear displeasure with the meeting, they concluded the letter by stating that they would contact Cotting and arrange a visit to evaluate it as a possible placement for D.B.  (*Id.* at 740; *see also id.* at 530).[10]

In November 2007, D.B.'s parents each separately visited Cotting.  (*Id.* at 472, 2358).  They also asked D.B.'s clinical neuropsychologist, Marsha Chaskelson, to visit Cotting and provide her professional opinion as to whether it would be an appropriate placement.  (*Id.* at 472, 2358, 805).  Following her visit on January 11, 2008, Chaskelson wrote D.B.'s parents a letter stating that the programing at Cotting does not match "the service delivery grids for the IEPs that have been proposed by Sutton," and that Cotting indicated that it would not accept a student that required a one-on-one aide.  (*Id.* at 805, 2384).

On March 23, 2008, D.B.'s parents sent a letter stating that "[a]s made clear in [our] correspondence of 10/30/07[, we] reiterate that we do not accept the IEP generated from the

---

[9] Sutton responded by a letter dated November 13, 2007.  In the letter, Sutton defended the qualifications of the IEP team and the thoroughness and open-mindedness of their evaluation.  (AR at 2027-28).  The letter also stated that the team recommended Cotting because it has "the necessary resources . . . to meet [D.B.'s] complex needs in the least restrictive placement," and indicated that Cotting has been identified as having one of the best programs for language based disabilities.  (*Id.* at 2028).

[10] The parents also indicated that they could attempt to craft a solution that meets D.B.'s needs that would be acceptable to all of the parties involved.  (AR at 740).

10/25/07 IEP meeting as we do not believe it provides [D.B.] with FAPE . . . ."  (*Id.* at 741).

They then stated that they would continue their current privately-developed programming for

D.B. and would expect Sutton to reimburse them.  (*Id.*).

During the summer of 2008, D.B.'s parents and Sutton worked together to find an

appropriate out-of-district placement.  (*Id.* at 473, 556-67, 2256-57).  A number of schools were

identified and actively reviewed by the parents and Sutton's staff, but for various reasons these

efforts to find an appropriate placement were unsuccessful.  (*Id.*).  On September 8, 2008, the

parents met with Austein and Messier to discuss the situation.  (*Id.* at 755).  In a letter following

the meeting dated September 10, 2008, Sutton indicated that in light of the circumstances (and

particularly, to provide D.B. with additional support for his toileting difficulty), home tutoring

might be the best option in the short term, with the ultimate goal of having D.B. participate in an

academic program in a public-school setting.  (*Id.* at 755).  Sutton interviewed various tutors,

including one suggested by D.B.'s parents, but did not ultimately hire or pay for a home tutor.

(*Id.* at 473).[11]

On October 21, 2008, D.B.'s parents provided Sutton with information concerning the

Integrated Center for Child Development ("ICCD").  They believed that ICCD could assist D.B.

with his toileting issues, apparently through a home-based system.  (*Id.* at 473, 619).  Sutton

agreed that this was an option that could be discussed at their next meeting.  (*Id.* at 473, 644).

---

[11] The relatively collaborative relationship between D.B.'s parents and Sutton appears to have broken down around the time of the September 10 letter.  The parents sent a lengthy reply dated September 22, 2008, indicating that they believed Sutton had misrepresented certain aspects of the meeting, and that they believed Sutton's attorney might have been involved in drafting the letter.  (*Id.* at 2258).

### 3.    2008-2009

The IEP team reconvened on October 27, 2008, to prepare an IEP covering the period

from October 27, 2008 to October 26, 2009.[12]  Sutton continued to express its willingness to

place D.B. within any appropriate private school, however no school agreeable to both parties

had been identified.  (*Id.* at 473).  Toileting was discussed as an important issue for D.B.  (*Id.*).

The Sutton members of the team proposed addressing these toileting issues through the school-

based programing, rather than through home-based models that the parents suggested and that the

parties had apparently discussed at the September 8 meeting.  (*Id.* at 473, 755).

The IEP that Sutton proposed, like the 2007-08 IEP, included several one-on-one

services, including speech-language and speech-apraxia services, transition services, fine-motor

and sensory services, social-adjustment counseling, gross-motor physical therapy, and English

Language Arts and Math tutoring.  (*Id.* at 468-69, 20).[13]  Unlike the earlier proposal, this IEP

suggested that D.B. to be placed in the intensive special needs classroom at Sutton.  (*Id.* at 468,

2084).  In November 2008, D.B.'s parents rejected this proposed placement and continued to

provide him educational services entirely through their privately arranged programming.  (*Id.*).

---

[12] The IEP Team consisted of D.B.'s parents, the Director of Special Education, a speech-language pathologist, and two of D.B.'s private tutors.  (AR at 497).

[13] The 2008-09 IEP listed toileting as one of D.B.'s educational needs and stated that a toileting schedule would need to be developed to address the issue and that "[s]pecific approaches shall be utilized for [D.B.] to follow regarding self-help and toileting development."  (AR at 2065-66).  The IEP set the following benchmark:

> [D.B.] will demonstrate improved functional dressing, hygiene/toileting, and grooming skills for greater independence in the school and home environments with decreasing levels of staff assistance to increase independence during his daily routine on 4 out of 5 presented opportunities as evidence[d] by data collection sheets.

(*Id.* at 2076).

The parents and Sutton continued to exchange letters and e-mails concerning D.B.'s toileting issues through May 2009.  (*Id.* at 474-75).  D.B.'s parents sent Sutton a letter from his pediatrician and other materials concerning ICCD that supported their position.  (*Id.* at 474).  They also allowed Sutton to conduct additional evaluations of D.B. to evaluate his toileting needs.  (*Id.* at 474, 662-63, 2144).  Specifically, the parents repeatedly requested that Sutton pay for ICCD to implement a home-based program to address D.B.'s activities of daily living ("ADL") needs, including toileting and self-care.  (*Id.*).  Sutton reviewed the parents' material, but consistently took the position that his toileting issues should be addressed through the existing IEP and within a school-based program.  (*Id.*).

In June 2009, D.B.'s parents retained Gregory Paquette as a consultant to help address, among other things, his toileting issues.  (*Id.* at 475).  Paquette made two visits to the parents' home, but the parents did not follow through, apparently because of Sutton's unwillingness to consider a home-based program and their own inability to pay for further services.  (*Id.*).

Since October 2007, D.B.'s parents have privately arranged for his special education and related services.  (*Id.* at 467).  Those services include one-on-one academic tutoring, occupational therapy, vision therapy, and speech-language services, as well as physical therapy, psychotherapy, and a weekly social group.  (*Id.*).  The parents are seeking reimbursement for some or all of those services.

## C.     Prior Proceedings

On June 12, 2009, D.B.'s parents filed a hearing request with the BSEA.  (*Id.* at 1-7).  They contended that Sutton committed several procedural errors in violation of the IDEA, and that the resulting IEPs (for various reasons) did not provide D.B. with FAPE.  They also

requested that Sutton be required to reimburse them for all of the costs associated with providing D.B.'s educational program during the two IEP periods.  (*Id.* at 7).[14]

The hearing took place over four days from late September to early November 2009 before Hearing Officer William Crane.  (*Id.* at 464).  Both parties were represented by counsel and had an opportunity to present documentary evidence and witness testimony as well as to cross-examine the other party's witnesses.  The hearing officer received more than 200 exhibits and heard testimony from eleven witnesses:  Katherine Carley, a private occupational therapist; Harry Bakow, a private psychotherapist; Mary Ellen Curran, a physical therapist employed by Sutton; Gina Iadarola, an occupational therapist employed by Sutton; Rebecca Ronstadt, a private tutor; Susan Messier, a speech/language pathologist employed by Sutton; Lorri Kenney, a special-education teacher employed by Sutton; Donna Sinkus, a special-education teacher employed by Sutton; Margery Horan, a special-education teacher employed by Sutton; Margo Austein, the Special Education Director for Sutton; and D.B.'s mother.

On January 26, 2010, the hearing officer issued a decision that included extensive findings of fact, and resolved the following seven issues:

> 1.  Did Sutton fail to advise Parents, in a timely manner, of their right to an evaluation and an IEP, in violation of the Hearing Officer's Decision of March 26, 2007 in BSEA # 05-3840?

---

[14] Specifically, plaintiffs requested that the hearing officer determine that:  (1) Sutton has not identified D.B.'s learning disabilities; (2) Sutton failed to advise the parents, in a timely manner, of their right to an evaluation and an IEP, in violation of the hearing officer's March 26, 2007 decision regarding an earlier IEP; (3) Sutton failed to use an appropriately-constituted IEP team when developing the two IEPs, thereby violating plaintiffs' procedural rights; (4) Sutton unilaterally proposed placement at Cotting for the 2007-08 IEP; (5) Sutton denied plaintiffs meaningful participation in the 2007-08 placement decision; (6) The IEPs developed for 2007-08 and 2008-09 failed to appropriately accommodate all of D.B.'s disabilities and needs and thereby denied him FAPE; (7) Sutton's proposals for services or placement were illusory because they either could not be implemented or were never seriously intended to be implemented by Sutton; (8) Sutton's actions violated plaintiffs' rights under various federal laws; and (9) plaintiffs are entitled to reimbursement for all costs associated with the educational program they provided to D.B. during the two IEP periods.  (AR at 6-7).

2.  Is the individualized education program (IEP) proposed by Sutton for the period 10/25/07 to 10/24/08 reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment?

3.  Is the IEP proposed by Sutton for the period 10/27/08 to 10/26/09 reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment?

4.  In developing the proposed placement for the period 10/25/07 to 10/24/08, did Sutton unilaterally pre-determine Student's placement and deny Parents meaningful participation in the placement decision, thereby resulting in violating Parents' procedural rights?

5.  In developing the 10/25/07 to 10/24/08 IEP and the 10/27/08 to 10/26/09 IEP, did Sutton fail to utilize an appropriately-constituted IEP Team, thereby resulting in violating Parents' procedural rights?

6.  Were Sutton's proposals for services or placement "illusory" because they either could not be implemented or were never seriously intended to be implemented by Sutton, thereby violating Parents' rights?

7.  In the event that Sutton has violated Parents' right to appropriate IEPs for the time periods of 10/25/07 to 10/24/08 and 10/27/08 to 10/26/09 or in the event that Sutton has otherwise violated Parents' rights (as referenced in paragraphs 1,4,5, and 6 above), are Parents entitled to reimbursement for part or all of their costs associated with the educational program provided to Student from 10/25/07 to 10/25/09?

(AR at 465).[15]

After carefully reviewing the evidence, the hearing officer determined that (1) although

Sutton failed to timely advise plaintiffs of their right to an evaluation, that claim was time-barred;

(2) the 2007-08 IEP did not provide D.B. with FAPE, because the suggested placement at

Cotting would not provide the services called for in the IEP; (3) the 2008-09 IEP did not provide

D.B. with FAPE with regard to his activities of daily living—specifically, his toileting issues; (4)

---

[15] The hearing officer stated that the issue of whether Sutton identified or understood the nature of D.B.'s learning disabilities was "subsumed within the general question of whether each IEP at issue was reasonably calculated to provide FAPE."  (AR at 465 n. 1).

Sutton did not predetermine D.B.'s educational placement for the 2007-08 IEP; (5) (a) the possible lack of a regular teacher on the IEP team for the 2007-08 IEP meeting did not impede D.B.'s right to FAPE, or his parents' opportunity to participate in the decision-making process; (b) the lack of a special-education teacher on the IEP team for the 2008-09 IEP meeting impeded D.B.'s parents the opportunity to participate fully or meaningfully in the IEP decision-making process regarding FAPE; (6) Sutton's placement proposals were not illusory; and (7) as to the 2007-08 IEP, plaintiffs were entitled to reimbursement for D.B.'s academic tutoring and occupational-therapy expenses, but not for his social group expenses; as to the 2008-09 IEP, plaintiffs were entitled to reimbursement for the services they obtained to address D.B.'s toileting and other activities of daily living to remedy the substantive error in the IEP, but they were not entitled to reimbursement for additional expenses because the procedural error did not cause plaintiffs substantive harm.  (AR at 481, 488, 493-94, 497-99, 500-06).

On April 19, 2010, plaintiffs filed this action in state court appealing the BSEA decision and contending that they were entitled to full reimbursement for the 2008-09 IEP period.[16]  The case was subsequently removed to federal court.  Sutton counterclaimed, alleging that the hearing officer erred in awarding reimbursement to plaintiffs.[17]

---

[16] Plaintiffs originally also brought other claims arising under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the ADA, 42 U.S.C. § 12101 *et seq.,* and 42 U.S.C. § 1983.  Those claims were dismissed in a prior order.

[17] The DESE contends that Sutton's counterclaim is barred because it did not file its appeal within 90 days of the BSEA decision.  (State Defs. Mem. at 10-11 &n.8); 20 U.S.C. § 1415(i)(2)(B) ("The party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action.").  The Court already considered this argument and rejected it when considering plaintiffs' motion to dismiss.  *D.B. v. Sutton Sch. Dist.,* 2011 U.S. Dist. LEXIS 11033, at *9-*11 (D. Mass. Feb. 3, 2011) ("[A] defendant does not 'bring an action' when it asserts a compulsory counterclaim under § 1415."  (citing *Jonathan H. v. The Souderton Area Sch. Dist.,* 562 F.3d 527, 530 (3d Cir. 2009)); *see also Doe v. Reg'l Sch. Unit No. 21,* 2011 U.S. Dist. LEXIS 58931, at *6-*9 (D. Me. June 1, 2011) ("[A] compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint." (quoting *Kirkpatrick v. Lenoir Cnty. Bd. of Educ.,* 216 F.3d 380, 388 (4th Cir. 2000)).

III.    **Standard of Review**

"In a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment." *North Reading*, 480 F. Supp. 2d at 481 n.1 (citations and quotations omitted).

The IDEA provides that a court reviewing the decision of the BSEA "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Supreme Court has explained that the district court's review entails both procedural and substantive aspects. *Rowley*, 458 U.S. at 205 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." ). Thus, in reviewing the appropriateness of an IEP, the court "must ask two questions: 'First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?'" *Roland M.*, 910 F.2d at 990 (quoting *Rowley*, 458 U.S. at 206-07).

The reviewing court must ensure that the school district and state education agency adhere scrupulously to the procedural requirements of the statute and relevant regulations and rules. *See Rowley*, 458 U.S. at 205-06 (noting that the Act "demonstrates the legislative

conviction that adequate compliance with the procedures prescribed would in most cases assure

much if not all of what Congress wished in the way of substantive content in an IEP.").

Substantively, a reviewing court's "principal function is one of involved oversight."

*Roland M.*, 910 F.2d at 989. "[C]ourts should be [loath] to intrude very far into interstitial details

or to become embroiled in captious disputes as to the precise efficacy of different instructional

programs." *Id.* at 992. "The *Rowley* standard recognizes that courts are ill-equipped to

second-guess reasonable choices that school districts have made among appropriate instructional

methods." *Lt. T.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004). "Judges are not

trained pedagogues, and they must accord deference to the state agency's application of its

specialized knowledge." *Lessard*, 518 F.3d at 24. Nonetheless, it is the district court's job to

render "an independent ruling as to the IEP's adequacy based on a preponderance of all the

evidence, including the hearing officer's duly weighted findings." *Lenn*, 998 F.2d at 1089. On

matters that implicate educational expertise, heightened deference is due to those administrative

findings. *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006).

However, "when the issue is more a matter of law, the educational expertise of the agency is not

implicated, and less deference is required." *Id.* at 157.

"[D]istrict courts frequently decide these cases without live testimony, on the basis of the

administrative record." *Roland M.*, 910 F.2d at 990. The administrative process is to be

accorded "its due weight" such that "judicial review does not become a trial de novo, thereby

rendering the administrative hearing nugatory." *Id.* at 996.

> The district court reviews the administrative record, which may be supplemented
> by additional evidence from the parties, and makes an independent ruling based
> on the preponderance of the evidence. That independence is tempered by the

requirement that the court give 'due weight' to the hearing officer's findings. This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

*Lt. T.B.*, 361 F.3d at 83-84.

In a case brought under the IDEA, "the burden of persuasion lies where it usually falls, upon the party seeking relief." *Schaffer*, 546 U.S. at 58.[18]

## IV.    Analysis

### A.    The Adequacy of the 2007-08 IEP

Sutton does not contest that the IEP as written required one-on-one instruction and that Cotting would not provide it. However, Sutton contends that the placement was nonetheless appropriate because the special expertise of the staff at Cotting makes one-on-one instruction unnecessary. That, however, is not the standard. Even assuming that Cotting would have adequately addressed all of D.B.'s needs, "[u]nder the IDEA, for a placement to be considered a FAPE, it must be provided at public expense, meet the standards of the State Education Agency, include appropriate education and *unfold in conformity with the IEP*." *Matthew J. v. Massachusetts Dep't of Educ.*, 989 F. Supp. 380, 387 (D. Mass. 1998) (emphasis added) (citing 20 U.S.C. § 1401(a)(18)); *accord* 34 C.F.R. § 300.116(b)(2) ("In determining the educational placement of a child with a disability . . . each public agency must ensure that . . . [t]he child's

---

[18] The DESE has moved to strike the three exhibits attached to plaintiffs' memorandum. The Court previously denied plaintiffs' motion to supplement the administrative record with documents that were substantially similar (and in one case identical) to the disputed exhibits. The documents describe D.B.'s status since he reentered Sutton on June 7, 2010. A student's subsequent progress under an IEP may be relevant in determining whether the IEP was objectively reasonable at the time it was made. *See Roland M.*, 910 F.2d at 991. However, the Court does not see how D.B.'s performance at Sutton (presumably under a different IEP) is relevant to the evaluation of the reasonableness of the IEPs at issue here. *C.f. Burlington v. Department of Educ.*, 736 F.2d 773, 791 (1st Cir. 1984) ("[A]n administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial."). The motion to strike will accordingly be granted.

placement . . . [i]s based on the child's IEP . . . .").  The determination of a student's appropriate

placement should only occur *after* the IEP is fully developed, 603 Mass. Code Regs. 28.05(6),

and the IEP Team is not permitted to "recommend a specific program unless it is assured that . . .

*the program can provide the services required by the student's IEP.*"  603 Mass. Code Regs.

28.06(2)(f)(2) (emphasis added).

To be sure, there will often be more than one way that a student could be provided with

an adequate education.  However, the IDEA establishes a collaborative process where the

relevant parties develop and agree upon the appropriate way to do so.  The Court need not

determine whether Cotting would have been an adequate placement for D.B.  Given that Cotting

would not implement the IEP that the parties developed, Cotting was not an appropriate

placement.[19]  After all, an IEP is not "reasonably calculated" to meet a student's needs, *see C.G.*,

513 F.3d at 284, if it calls for the student to be placed in a school that will not address those

needs as they are stated in the IEP.

Sutton nonetheless contends that hearing officer erred by not considering that IEPs are

typically  "realigned" to fit the facility at which the student is ultimately located.  However, the

hearing officer explicitly considered this argument and found it unpersuasive.  (AR at 485-86).

While some adjustment to an IEP to make it operable in a specific placement may often be

---

[19] Sutton also briefly contends that a prior BSEA decision that considered the 2005 IEPs is "due collateral estoppel effect" because it found, in *dicta*, that Cotting would be an appropriate placement for D.B.  (Def. Mem. at 11).  However, the IEPs at issue in that proceeding were addressing D.B.'s needs in 2005 and did not mention one-on-one services.  (*See* AR at 485-76).  The hearing officer in that proceeding did not make a factual finding regarding the fact at issue here, namely whether Cotting, in 2007, was willing and able to provide the services (including one-on-one services) detailed in the 2007-08 IEP.  *See Mercado-Salinas v. Bart Enters. Int'l*, 671 F.3d 12, 21-22 (1st Cir. 2011) ("Collateral estoppel applies when '(1) *the issue sought to be precluded in the later action is the same as that involved in the earlier action*; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.'" (emphasis added, citation omitted)).

necessary, as the hearing officer observed, the IEP at issue here (that specifically called for the delivery of several one-on-one services) would have to be substantively changed in order to be operable at Cotting (a placement that would not provide any one-on-one services).  In substance, Sutton appears to argue that although Cotting would not implement the IEP as written, that the placement was still appropriate because the IEP would be adjusted to fit the placement after the fact.  However, the IDEA (and the relevant regulations) plainly require that the placement be based upon the IEP, and that an IEP not be substantively written (or rewritten) to fit a specific placement.  *See* 34 C.F.R. § 300.116; 603 Mass. Code Regs. 28.05(6); 603 Mass. Code Regs. 28.06(2)(f)(2).

### B.     Reimbursement

Sutton contends that even if the IEP was inappropriate, the hearing officer erred in ordering that plaintiffs be reimbursed for their private services.  Reimbursement is an equitable remedy that "is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative."  *C.G.*, 513 F.3d at 289; *accord Roland M.*, 910 F.2d at 999.

As discussed, the 2007-08 IEP failed to provide appropriate services to D.B. Furthermore, plaintiffs diligently pursued an appropriate placement for D.B. through the IEP process.  Plaintiffs and Sutton exchanged numerous e-mails indicating a collaborative search for an appropriate private placement (including plaintiffs' good-faith evaluation of Cotting). Although the search proved fruitless, the hearing officer determined that this was not due to the bad faith or lack of cooperation of the parties.  Rather, the hearing officer found that plaintiffs

had demonstrated a willingness to consider out-of-district placements for D.B., and that, by proposing an inappropriate placement, Sutton precluded D.B. from receiving the services described in the IEP, thereby him denying FAPE.  As the both plaintiffs and Sutton point out in their memoranda, the record could support a finding that the parties were not without fault in the process.[20]  However, the hearing officer carefully considered these arguments and all of the evidence presented by the parties.  He was not confined to a cold record, and made his factual findings after hearing live testimony from the relevant parties.  (AR at 471-72, 487-88).  After a careful review of the record, the Court agrees that based on a preponderance of the evidence (and giving the hearing officer's factual findings due weight) that plaintiffs diligently pursued the provision of appropriate services through the 2007-08 IEP process.

Sutton contends plaintiffs are nonetheless not entitled to reimbursement because the privately-arranged services plaintiffs provided were not appropriate.  The private placement need not meet all of the statutory requirements of FAPE in order for plaintiffs to receive reimbursement.  *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 13-14 (1993).  Rather, it "need provide only 'some element of the special education services' missing from the public alternative in order to qualify as reasonably calculated to enable the child to receive educational benefit."  *Mr. I.*, 480 F.3d at 25 (citation omitted).

The record indicates that plaintiffs provided D.B. with one-on-one academic tutoring and occupational and other therapy, as well as a weekly social group.  Other than the social group, these services closely resemble those called for in the IEP.  The hearing officer examined these

---

[20] For example, plaintiffs purported to reject the IEP for the reasons they articulated before they considered Cotting or the other proposed placements.  (*See* AR at 741).

services and concluded that only the social group did not provide some element of the services missing from Sutton's proposed placement.  The appropriateness of parent-arranged services "is a fact-intensive inquiry that relies on credibility determinations[, ] which the hearing officer, with both expertise and contemporaneous perspective, is in a better position than [the Court] to make []."  *North Reading Sch. Comm. v. Bureau of Special Educ. Appeals of the Mass. Dep't of Educ.*, 480 F. Supp. 2d 479, 490 (D. Mass. 2007).  In light of this, and after examining the record, the Court sees no need to disturb the hearing officer's conclusion that plaintiffs' privately-arranged services were appropriate.  Plaintiffs are therefore entitled to reimbursement for academic tutoring and occupational therapy services for the period of the 2007-08 IEP.

### C.    The Adequacy of the 2008-09 IEP

The hearing officer determined that the 2008-09 IEP suffered from two defects:  (1) it violated the substantive requirements of the IDEA by not appropriately addressing D.B.'s toileting issues, and (2) it violated the procedural requirements of the IDEA by using an improperly constituted IEP team, thereby significantly impeding plaintiffs' opportunity to participate in the decision-making process regarding FAPE.  The hearing officer then awarded plaintiffs reimbursement for the consultation costs they incurred in addressing D.B.'s toileting, but did not award any further reimbursement.  Plaintiffs contend they were entitled to reimbursement for all of the privately-arranged services for the 2008-09 IEP period.[21]  Sutton

---

[21] Plaintiffs also briefly assert that the hearing officer erred in finding that their claim related to the 2005 IEP decision was barred by the IDEA's two-year statute of limitations.  20 U.S.C. § 1415(f)(3).  Plaintiffs assert that there is no definitive time at which the limitations period began to run.  However, the hearing officer correctly concluded that determining a definitive start time was unnecessary.  Plaintiffs filed their BSEA hearing request on June 15, 2009.  Thus, the issue is whether plaintiffs' claim would have accrued by June 17, 2007—that is, whether Sutton had failed to "*immediately* notify the Parents of their rights to evaluation and a new IEP . . . ." by that date.  *In Re Sutton*, 13 MSER 95 (emphasis added); (AR at 480).  Sutton was ordered to "immediately" notify plaintiffs on March 28, 2007.  Even a generous interpretation of the term "immediately" in the context of the need to develop

contends that the 2008-09 IEP provided D.B. with FAPE and that the composition of the IEP

team did not amount to a procedural violation, and, accordingly, reimbursement was not

warranted.

### 1.    Procedure

Sutton contends that the hearing officer erred in finding that absence of a special-

education teacher from the IEP Team amounted to a legally defective procedural violation.

While courts must strictly ensure the procedural integrity of IEPs, that strictness "must be

tempered by considerations of fairness and practicality:  procedural flaws do not automatically

render an IEP legally defective." *Roland M.*, 910 F.2d at 994.  Rather, "there must be some

rational basis to believe that procedural inadequacies compromised the pupil's right to an

appropriate education, seriously hampered the parents' opportunity to participate in the

formulation process, or caused a deprivation of educational benefits." *Id.*

The IDEA requires that the IEP Team consist of (1) the parents of the child; (2) at least

one regular education teacher of the child (if he will be participating in the regular education

environment); (3) at least one special-education teacher, or, if appropriate, at least one special-

education provider of the child; (4) a representative of the school who is qualified to provide or

supervise the provision of the relevant services, and is knowledgeable about the general

curriculum and resources of the school; (5) a person who can interpret the instructional

implications of the child's evaluation results; (6) at the parties' discretion, other people who have

knowledge or special expertise about the child; and (7) if appropriate, the child himself.  20

---

annual IEPs would connote a period of less than two and a half months.  *C.f. Burlington*, 736 F.2d at 800
("Implementation of a state agency's determination of the appropriate education for a disabled child should not be
delayed until the statute of limitations on an appeal has run . . . .").

U.S.C. § 1414(d)(1)(B); *see also* 34 C.F.R. § 300.321.  The IEP team here did not have either a regular or a special-education teacher.

The absence of one required member of an IEP team will not always result in a legally defective error.  *See, e.g.*, *A.H. ex rel. J.H. v. Dep't of Educ.*, 394 Fed. Appx. 718, 720 (2d Cir. 2010) (finding the absence of student's special-education teacher from the IEP meeting did not limit the parents' ability to participate in the decision making process).  However, every IEP is unique, and the importance of a single team member will often depend on the nature of the child's disability and the knowledge of the parties.  *Cf. Lessard*, 518 F.3d at 23 ("IEPs are by their very nature idiosyncratic." (citation omitted)).

Although the 2008-09 IEP team included Sutton's Director of Special Education, it did not include *any* teacher from Sutton who would be actually teaching D.B.  *See R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 940 (9th Cir. 2007) ("[W]e interpret the statute and regulation to require a special education teacher who has actually taught the student."); *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 615 (E.D. Pa. 2008) (finding composition of IEP team violated the IDEA where the regular education teacher on the team had never taught the student).  The hearing officer reasoned that a special-education teacher who would be working with D.B. at Sutton, or one that could describe the actual services, staffing, and classroom being proposed, would have been able to "explain to and discuss with [plaintiffs] the proposed special education classroom, the accommodations and services that would be provided within it, how those accommodations and services would meet [D.B.'s] needs, the staffing of the classroom and [D.B.'s] likely peers." (AR at 498)  This input would have allowed plaintiffs to better understand the services Sutton was offering and more fully participate in the decision-making

process.  The hearing officer emphasized that this interaction is especially important where the

student—like D.B.—has extraordinarily complex learning disabilities and the parents are well-

versed in meeting those needs.  (*Id.* at 499).

The Court agrees with the analysis of the hearing officer.  D.B's disabilities are uniquely

complex and his parents have zealously engaged in the development of an alternative placement

for him.  In these circumstances, the lack of a special-education teacher or other representative

who could explain the specific nature of Sutton's programming and how it would be applied to

their son's education "seriously hampered the parents' opportunity to participate in the

formulation process" of the IEP.  *Roland M.*, 910 F.2d at 994.

### 2.    Substance

The only substantive issue related to the 2008-09 IEP that is a subject of this appeal is

that of D.B.'s toileting.  Put simply, Sutton contends that the IEP adequately addressed D.B.'s

toileting difficulties as they were understood at the time; plaintiffs (and the hearing officer)

disagree.

The parties do not dispute that D.B.'s toileting difficulties needed to be addressed.[22]

Sutton contends however that the extent of D.B.'s toileting needs were not evident when the IEP

was developed in October 2008.  The school district has an "obligation to devise a

custom-tailored IEP" for the student.  *See Lessard*, 518 F.3d at 23; *accord Rowley*, 458 U.S. at

181.  However, "[a]n IEP is a snapshot, not a retrospective.  In striving for 'appropriateness,' an

---

[22] Indeed, both parties presented evidence that demonstrated that D.B. required a comprehensive toileting program that included home-based services and that his toileting difficulties arose from his disability.  (*See* AR at 490-92).

IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M.*, 910 F.2d at 992.

The record indicates that Sutton was aware of D.B.'s toileting difficulties at least as early as October 2007.  The 2007-08 IEP contains language concerning D.B.'s toileting that is substantially similar to the language contained in the 2008-09 IEP.  In early September 2008, Sutton indicated that home-tutoring was the best option in the short term to address D.B.'s toileting difficulty.  Just prior to the October 2008 IEP team meeting, plaintiffs again brought up D.B.'s toileting issues and presented Sutton with information regarding ICCD, an organization that could develop a home-based system to address those issues.  Sutton replied that they would discuss it at the meeting.  Despite the parties' discussion of toileting at the team meeting, the 2008-09 IEP included an identical description of D.B.'s "current" performance level and recommended goals for toileting as that in the 2007-08 IEP.[23]

Weighing this evidence, the hearing officer concluded that despite its obligation to create a custom-tailored IEP based on information that it reasonably should have obtained, Sutton failed to appropriately address D.B.'s toileting issues.  The Court agrees with the hearing officer.  The preponderance of the evidence supports a finding that the 2008-09 IEP failed to adequately address D.B.'s toileting issues.

**D.**     **Reimbursement**

---

[23] Shortly after the IEP team meeting, Sutton conducted additional evaluations of D.B. and the parties exchanged more information concerning D.B.'s toileting issues, including a letter from D.B.'s pediatrician explaining [his] view that providing D.B. with in-home toileting services was a medical necessity.  (AR at 474, 493, 659-60, 2281).

While the composition of the IEP team "seriously hampered" plaintiffs' ability to participate in the development of the IEP, *see Roland M.*, 910 F.2d at 994, the resulting IEP nonetheless adequately addressed all of D.B.'s complex educational and other needs but one—namely, toileting.  As discussed above, reimbursement is an equitable remedy and the hearing officer balanced the equities against that backdrop, ultimately concluding that plaintiffs were only entitled to reimbursement for the services they engaged to address D.B.'s toileting needs.  The Court agrees.

Plaintiffs never ultimately developed an alternative home-based toileting program for D.B. (apparently for financial reasons).  However, the two consultation sessions were an appropriate and necessary first step in developing such a program, and such a program was necessary in order for D.B. to receive FAPE.  Given that the IEP was otherwise adequate, awarding reimbursement for only these costs was appropriate to address the substantive flaw in the IEP.

Plaintiffs contend, however, that they are entitled to further reimbursement due to the procedural flaws in the composition of the IEP team.  The hearing officer reasoned that although there was a procedural violation of the IDEA, plaintiffs were not substantively harmed because they would have likely rejected a placement in Sutton even if the IEP team had been properly constituted.[24]  This factual finding is also consistent with the parties' prior conduct.  Plaintiffs removed D.B. from the Sutton school system in 2005 despite the school's willingness to implement an adequate IEP, and the parties have been in constant litigation since that time.

---

[24]   The hearing officer expressly relied on D.B.'s mother's testimony when determining that plaintiffs would not accept a placement at Sutton.  (AR at 504).

Moreover, during this litigation, plaintiffs have consistently maintained that Sutton does not understand (or care about) D.B.'s special-education needs.  (*See, e.g.*, *id.* at 738-40; 422-30).[25]

Plaintiffs contend that the hearing officer cannot make his determination based on his prediction of how they would have acted.  However, just as plaintiffs' willingness to accept another private-school placement was relevant to the hearing officer's determination that they were entitled to reimbursement for the 2007-08 IEP, their unwillingness to accept a placement at Sutton is relevant in determining whether they are entitled to reimbursement for the 2008-09 IEP.  "[I]f parents act unreasonably in the course of [the IEP development] process, they may be barred from reimbursement under the IDEA."  *C.G.*, 513 F.3d at 288.  Implicit in the hearing officer's reasoning was his determination that plaintiffs acted unreasonably with regard to the possibility of placing D.B. in Sutton.  (*See* AR at 504 ("Parents have been willing to explore, in good faith, private placements . . . for Student.  But, Parents have . . . consistently refused to consider a placement back into the Sutton Public Schools.").  In sum, plaintiffs may only receive reimbursement if they "diligently pursued the provision of appropriate services from" Sutton, and the Sutton failed to provide those services.  *C.G.*, 513 F.3d at 289.  That did not occur here.[26]

Given the years of litigation between the parties, plaintiffs' feelings toward Sutton may be understandable.  Plaintiffs clearly care about their son and should be commended for their tireless efforts to ensure that he receive the best possible education.  However, Congress designed the IEP development process to be collaborative, requiring both parties to work together to develop

---

[25] In fact, in their correspondence to Sutton in the months preceding the IEP team meeting, plaintiffs indicated that they believed Sutton was acting through their lawyer to create a record for litigation rather than in the interest of D.B.  (AR at 2261; *see also id.* at 2258).

[26] The Court notes that plaintiffs' failure to diligently pursue an appropriate placement within Sutton starkly contrasts with their (warranted) pursuit of home-based toileting services.

an appropriate program to address the child's needs.  As discussed above, despite the very clear

tension between them, plaintiffs and Sutton have often been able to do that.  However, plaintiffs'

consistent refusal to consider a placement at Sutton during the development of the 2008-09 IEP,

"whether or not well-intentioned, constitutes an unreasonable approach to the collaborative

process envisioned by the IDEA."  *Id.* at 288 (citing *Roland M.*, 910 F.2d at 995).[27]

Here, plaintiffs did not diligently pursue the provision of services from Sutton;

nonetheless, the resulting IEP provided appropriate services in all but one respect—toileting.  In

light of this, the hearing officer properly balanced the equities and was well within his discretion

in denying plaintiffs reimbursement in areas beyond toileting.[28]

---

[27] D.B. has apparently been placed back in Sutton.  Plaintiffs contend that this illustrates that the hearing officer erred in determining that they would not have accepted a Sutton placement for the 2008-09 IEP.  Although plaintiffs' subsequent actions may have some relevance in determining their motivations in October 2008, there are many factors that may have caused plaintiffs to place D.B. in Sutton.  For example, they have done so due to the expense of ongoing private care and litigation, or may have been directly responding to the hearing officer's decision in this case.  Thus, while relevant, plaintiffs' subsequent placement of D.B. in Sutton does not affect the preponderance of the evidence that demonstrates that they were not willing to accept a Sutton placement at the time the IEP was being developed.

[28] Plaintiffs argue that not awarding reimbursement will mean that Sutton's procedural violation will go unpunished, and Sutton will not be deterred from committing future violations.  However, simply because reimbursement is an inappropriate remedy here, it does not follow that it will be in the future or that all other forms of relief would have been foreclosed.  *See* 20 U.S.C. § 1415(i)(2)(B)(ii) ("[The court] shall grant such relief as the court determines is appropriate."); *id.* § 1415(i)(3)(B)(i) ("[T]he court, in its discretion, may award reasonable attorneys' fees . . . .").  Plaintiffs, however, have only requested reimbursement.

**V.**      <u>**Conclusion**</u>

For the foregoing reasons, the Massachusetts Department of Elementary and Secondary Education's motion to strike is GRANTED.   The motion for summary judgment of the Sutton School District, and the Sutton School Committee is DENIED.   Plaintiffs' cross-motion for summary judgment is DENIED.   The BSEA decision is AFFIRMED.

**So Ordered.**

 /s/  F. Dennis Saylor_____

F. Dennis Saylor IV

Dated: August 14, 2012                  United States District Judge